HANLON, JUDGE:
*79 Claimant S. J. Groves and Sons Company (hereinafter referred to as Groves), a Minnesota based general contractor, entered into a contract with respondent on January 10, 1979, for the construction of two bridges, designated Project Numbers APD-323 (69) and APD-323 (59). Groves also entered into a contract with respondent on March 29, 1979 for the construction of a third bridge, designated Project Number ID-77-2 (49/64). These projects, known as the Mingo County Bridge, the Kanawha County Bridge, and the Fayette County Bridge, respectively, are the subject of these claims. On June 13, 1983, Dallas A. Wolferd, Vice President of Groves, executed an assignment of its rights to pursue the claims before this Court to Atlas Machine and Iron Works, Inc. (hereinafter referred to as Atlas), the structural steel fabricator for these projects. The work on the projects was done in Gainesville, Virginia. The original amount of the claim was amended to $2,440,013.00 at the hearing.
The following documents were placed in evidence by written stipulation of the parties:
Part 2 of the general Plans of Construction.
Standard West Virginia Department of Highways Standard
Specifications Roads and Bridges (1978).
Supplemental Specifications (January 1, 1979).
1973 publication of Steel Structures Painting Manual.
Atlas alleges that due to factors within the control of respondent, it experienced severe cost overruns, substantial increase in the main hours expended on these projects, and that it incurred expenses in excess of the increased costs.
Werner H. Quasebarth, President of Atlas, testified that Atlas is a structural steel fabricator which was founded by his father in 1930. In addition to approximately 30 bridges in West Virginia, it fabricated the steel for projects in Georgia, South Carolina, North Carolina, Virginia, District of Columbia, Maryland, Delaware, New Jersey, Pennsylvania, New York, Connecticut, Massachusetts and Ohio.
There were approximately 300 steel girders to be fabricated by Atlas in the three projects which are the subject of these claims. The typical girder to be fabricated for these projects averaged 100 feet in length, 5 feet deep and weighed approximately 10 tons. One of the major elements in fabricating steel girders involves surface preparation.
During the' process of surface preparation, the fabricator removes mill scale that has oxidized on the girder when the steel was rolled into the girder form. To remove the mill scale, the girder is placed in a Wheel-a-brator which propels shot at the girder to remove the mill scale uniformly. The respondent's Standard Specifications Road and Bridges, Adopted 1978 provides *80 a "near white" surface specification. Atlas was required to achieve a "near white" surface on each girder. Atlas considered the interpretation of "near white" by the respondent to be too stringent. Atlas attempted to achieve the results desired by the respondent by preblasting and reblasting girders. Quasebarth explained that the reblasting required caused production problems of the Atlas fabrication plant. There was a continual stoppage of steel members in an attempt to satisfy the requirements of respondent's inspectors assigned to these projects.
He stated further that it is normal practice to break the corners on the flanges of the steel girders, but Atlas was required by the inspectors on the project to radius the edges on the flanges. Hackles, which are small spurs of steel that penetrate the coating of the paint, also created a problem, according to Quasebarth. Other problems arose from interpretation by the inspectors of overspray or dry spray. There were difficulties in getting orderly inspection done. All of these problems backed up not only the project that was being completed, but it also created a backlog of steel being stored at the Atlas foundry. The work at Atlas from January 1980 through August 1980 was related to fabricating steel for these projects and comprised 50 percent of Atlas' work during this period of time.
Once the girder has completed the surface preparation process, the girder is then spray painted with an inorganic zinc paint. The girder is inspected at this point for proper thickness of the paint. On this project, a 4 mil thickness of paint was required. Where the inspectors determined that overspray or dry spray occurred on the girder. Atlas was required to either reblast or hand sand the areas of overspray. This became a major problem for Atlas.
Atlas also alleged problems occurred during the process of breaking the edges on the flanges of the steel girders. Normal practice in the industry is to brake the edges. Atlas contends that it was required to grind the edges so that the edges were radiused. This hand work required many man hours of time. The respondent contends that the inspectors on the problems never required Atlas to radius the edges. The respondent did expect the edges to be broken and the burr or sharp edge removed.
Another area which caused considerable concern on the part of Atlas was the requirement to remove mill scale in the snipes. Snipes are areas on the inside corners of the flanges. Atlas contends that it was required to hand blast each snipe area in a girder in order to remove the mill scale. The inspectors were using flashlights, dental mirrors, and magnification glasses to determine if the snipes contained mill scale. It was then necessary to hand blast every snipe area in a girder to achieve the surface preparation being required by the respondent's inspectors. As a result of this problem, there was a meeting held on March 19, 1980.
At that meeting, Bill Shuler, a chemist with respondent, agreed that the snipe mill scale was not detrimental and did not have to be removed. However, personnel at Atlas were not notified until May 1, 1980, that a decision had been made regarding this problem. During the interim period, however, claimant was required to expend extra labor for the removal of the mill scale in all of the snipe areás on the girders.
*81 In order to attempt to maintain a work schedule to meet the respondent's requirements for steel fabrication, Atlas started working weekends, and then a third shift. Atlas paid for the extra work. Men were idle waiting for decisions to be made on inspected items. This resulted in extra costs to Atlas.
Dr. Felix Konstandt, President and Technical Director of Konstandt Laboratories, Inc., testified that his firm is engaged in the testing, evaluation and development of coatings and paints. He stated that he uses the Swedish standard in terms of evaluation and painting and that the Steel Structure Painting Counsel is the American equivalent of the Swedish Academy. Dr. Konstandt explained that there are three separate standards of cleanliness imposed by the Swedish standards. Sa 3 is a white metal blast. Sa 2 1/2 is a near-white blast and Sa 2 is a commercial blast. He stated that a near-white blast permits five percent of impurities to be present on the overall surface of the steel.
He further explained that it is necessary to clean the steel as the paint has to be applied to clean surfaces. Paint is applied to the steel to prevent corrosion of the steel. His definition of "a near white blast" permits 5 percent of impurities to be present on the over all surface. He described hackles or slivers as impurities that are formed on the steel or have been formed on the steel during fabrication and stated that it is practically impossible to achieve 100 percent removal of all mill scale on standard job sites. He testified that he read the West Virginia Specifications. In his opinion the provisions in these Specifications are more stringent than the specifications normally required in the industry.
Common problems which occur during the painting operations include pinholes, sags and overspray or dry spray. Dr. Konstandt indicated that there is no mention made of dry overspray in any painting specification on structural steel. In his opinion the reblasting which results from the removal of the overspray does some injury to the surface of the steel. He also testified that the industry did not consider overspray to be a defect or a flaw in the fabrication of steel girders.
Charles F. Jarrard, Jr., consultant to the fabrication industry, testified as an expert for Atlas. He has been involved with the fabrication of approximately 50,000 tons of steel for the State of West Virginia. He stated that surface preparation of the steel is generally outlined in the State Specifications and that the majority of states today reference the Steel Structures Painting Council. This Council references the Swedish Standard. He testified that if there was a disagreement over what was being produced, hopefully, there would be a meeting of the minds within the plant and the problem would be resolved. He mentioned that generally, the fabricator gives up because he needs the cash flow.
His experience with West Virginia goes back to 1959 or 1960. He stated, "In plain words, cleaning and painting was a bigger problem in West Virginia, than probably any other state that I have worked in,". Jarrard testified that he does not know of any requirement imposed by the specification to remove overspray. "I believe that removal of all overspray is unrealistic and impractical." He also said that regarding hackles, West Virginia took the position that you had *82 to get the profile back. This did not occur in any other state. A girder is placed back in the blasting unit to create the profile. Then, it is reblasted. A girder could be blasted as many as seven times. In the industry, it is normal and customary to break edges, certainly on flanges.
In discussing the Standard Specifications of West Virginia in comparison with other states, he stated, "I guess because I've done so much West Virginia work, I don't really feel they're that much more stringent than anybody else."
The position of Atlas in this claim is that the inspectors for the respondent, who were assigned to inspect the steel being fabricated for these three projects, imposed standards upon Atlas which were not a part of the Standard Specifications. The standards imposed upon Atlas were alleged to be beyond what custom and usage would normally dictate and were outside the scope of the specifications in the contract.
The consensus of the opinion of respondent's employees was that all mill scale had to be removed from the surface of the steel. This was the standard applied on these projects.
The respondent's Standard Specifications provides for surface preparation as follows:
§615.6.4 - Surface Preparation: All structural steel surfaces shall receive a very thorough blast (near white) cleaning prior to painting. Mill scale, rust, weld spatter and foreign matter shall be removed to the extent that the only traces remaining are slight stains in the form of spots or stripes. The appearance of the steel surface after very thorough blast cleaning shall correspond with the following pictorial standards: A Sa 1 1/2, B Sa 2 1/2, C Sa 2 1/2, or D Sa 2 1/2 of SSPC-Vis 1 ... .
Blast cleaning operations shall be done in such a matter that no damage is done to partially or entirely completed portions of the work. After blast cleaning, any areas which are repaired by welding shall be blast cleaned. Areas repaired by grinding or other means shall have the anchor pattern restored by blast cleaning, or as directed by the Engineer... .
The interpretation of this specification created the problems as to surface preparation of the steel girders. The respondent employed Pennsylvania Testing Laboratories to provide inspectors on the project. The inspectors followed the directions of respondent's employees in requiring the removal of all mill scale on the girders.
The respondent contends that its inspectors applied the Specifications in the same manner as they would have applied them in any fabrication of steel project. The Standard Specifications required a "near white blast." According to the position of Atlas a "near white blast" does not *83 mean the removal of all "mill scale". The respondent's position is that the interpretation of "near white" means the removal of "all mill scale". The specification provides that "Mill scale...shall be removed to the extent that the only traces remaining are slight stains in the form of spots or stripes."
It is the opinion of the Court that the inspectors were following the dictates of the respondent's Specifications in requiring Atlas to remove all mill scale from the surface of the fabricated steel. Therefore, Atlas is not entitled to the extra costs for work which resulted from this requirement by the respondent's inspectors.
As to the second problem which caused considerable concern on the part of Atlas involving the application of inorganic zinc paint to the fabricated steel, the Court has determined that there is merit to Atlas' contention that the inspectors were unreasonable in interpretation of the project specifications for dry spray or overspray of the paint. The paint was furnished by Mobile in accordance with the respondent's specifications. The specifications required a 4 mil coat. It was necessary for Atlas to reblast steel girders in an attempt to satisfy the inspectors. Atlas also resorted to using manual labor in removing the overspray which resulted in many hours of extra labor costs. The respondent contends that excessive paint overspray must be removed in order to avoid problems with the application of field paint.
While bridge inspectors from West Virginia appear to be more strict in their inspections on projects, the Court considers this adherence to quality standards to be reasonable in light of the failure of the Silver Bridge at Point Pleasant, West Virginia, which occurred in December 1967, and, in finding some liability in this claim, we afe in no way inferring criticism of the respondent or its inspection in this regard.
It is the opinion of the Court that respondent's inspectors were conscientious in their interpretation of the Specifications applying to overspray or dry spray of the paint. Accordingly, Atlas was required to perform some extra work for this item. It is the opinion of the Court, however, that Atlas is not entitled compensation for this work.
As to the problem of the radius on the edges versus broken edges on the flanges of the steel girders, the Court is of the opinion to disallow this item. The evidence is clear that Atlas performed this extra work on the edges of the flanges on its own accord rather than at the insistence of respondent's inspectors.
The problem with the removal of mill sale in the snipes of the steel girders did cause Atlas to incur costs for extra work performed in an attempt to satisfy the standards being applied by the respondent’s inspectors. The Court is of the opinion that the respondent's employees failed to adequately and timely advise Atlas of its decision regarding the removal of mill scale in the snipes on the steel girders. This failure caused extra labor costs for claimant. Therefore, the Court makes an award in the amount of $217,259.56 for labor costs for the extra work performed during *84 the specific time period as indicated heretofore in the opinion to S. J. Groves and Sons Company, for the benefit of Atlas Machine and Iron Works, Inc.
Award of $217,259.56.